IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MELISSA CHEN and DARIO SALAS, on behalf themselves and all others similarly situated,<br><br>          Plaintiffs,<br> v.<br>GENESCO, INC. and HAT WORLD, INC. d/b/a LIDS,<br><br>          Defendants. | Case No. 18 Civ. 690-SEB-TAB |

**DECLARATION OF JUSTIN M. SWARTZ IN SUPPORT OF
PLAINTIFF'S UNOPPOSED RENEWED MOTION FOR APPROVAL OF
COLLECTIVE ACTION SETTLEMENT, SERVICE PAYMENTS, AND
ATTORNEYS' FEES AND COSTS**

I, Justin M. Swartz, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

  1.  I am a partner at Outten & Golden LLP ("O&G") in New York, NY, and co-chair of its Class Action Practice Group. O&G is a 70+ attorney firm with offices in Chicago, New York City, San Francisco, and Washington, D.C., which focuses on representing plaintiffs in a wide variety of employment matters, including individual and class action litigation, that involve wage and hour, discrimination, and harassment claims, as well as contract and severance negotiations.

  2.  I am an attorney in good standing admitted to practice in the State of New York and before this Court *pro hac vice*.

  3.  Together with lawyers from co-counsel firms Shavitz Law Group, P.A. ("SLG") and Cohen & Malad, LLP, I have been one of the lawyers primarily responsible for the prosecution of Plaintiff's claims against Defendants Genesco, Inc. and Hat World, Inc. d/b/a Lids (referred to herein as "Defendants" or "Lids").

4.      I make the statements in this Declaration based on my personal knowledge and would so testify if called as a witness at trial.

**Background and Experience**

5.      I received my J.D. from DePaul University School of Law in 1998 with honors and since then I have exclusively represented plaintiffs in employment litigation and other employee rights matters. I was admitted to the bar of the State of Illinois in 1998 and the bar of the State of New York in 2002. I am active in bar associations and have held many leadership roles including the following, among others: American Bar Association Section on Labor and Employment Law, Co-Chair of Equal Employment Opportunity Committee (2013-2015); Co-Chair Ethics and Professional Responsibility Committee (2006 through 2009); New York City Bar Association, Civil Rights Committee (2005 through 2008); Committee on Labor and Employment Law (September 2002 through June 2005); National Employment Lawyers Association ("NELA"), co-chair of national Wage and Hour Practice Group (2010 through 2016); NELA - New York Chapter, Executive Board Member (2006 through 2012); and New York University Center for Labor and Employment Law, Advisory Board Member (2007 through present). I speak frequently on employment law issues, including wage and hour issues.

6.      Juno Turner is a partner in O&G and has been a member of its Class Action Practice Group since joining the firm in 2009. She received her J.D. from Fordham Law School in 2006, then served as a law clerk to the Honorable James Orenstein in the Eastern District of New York and worked for two years in the Labor Bureau of the New York State Attorney General's Office, where she investigated and prosecuted minimum wage and overtime violations. She is a member of the American Bar Association's Labor and Employment Law Section and its Federal Labor Standards Legislation Subcommittee. She is also a member of the

National Employment Lawyers Association ("NELA") and NELA's New York chapter. She speaks periodically on employment law issues, including wage and hour topics.

7.   Christopher M. McNerney is an Associate at O&G who works in the Class Action Practice Group. He represents employees in litigation and negotiation in all areas of employment law, including wage and hour and discrimination class actions. Before joining O&G in 2013, he clerked with the Honorable Sarah Netburn of the Southern District of New York. Mr. McNerney received his B.A., *cum laude*, from Macalester College in 2005, and his J.D., *cum laude*, from New York University School of Law in 2012. Mr. McNerney was named one of the 2017 Trial Lawyers of the Year by Public Justice.

8.   Michael C. Danna is an associate at O&G in New York, NY, where he represents workers in class action wage and hour and discrimination cases. Prior to joining the firm in September 2017, Mr. Danna clerked for the Honorable Tanya S. Chutkan on the U.S. District Court for the District of Columbia. He received his B.A. from Brown University in 2011 and his J.D., *cum laude*, from New York University School of Law in 2017, where he was a Root-Tilden-Kern Scholar.

## O&G's General Expertise

9.   O&G is experienced and nationally recognized for its expertise in litigating complex class actions, including wage and hour cases like this one. *See, e.g.*, *Straunch v. Computer Science Corp.*, 322 F.R.D. 157, No. 14 Civ. 956, 2017 WL 2829652, at *24 n.15 (D. Conn. June 30, 2017) (in wage and hour litigation, finding that O&G "adequately represent[s] the interests of the putative class"), motion to decertify denied, 2017 WL 4683993 (D. Conn. Oct. 18, 2017); *Walsh v. CorePower Yoga LLC*, No. 16 Civ. 5610, 2017 WL 589199, at *8 (N.D. Cal. Feb. 14, 2017) (O&G has "a proven track record in the prosecution of class actions as they

have successfully litigated and tried many major class action cases"); *Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160, 2016 WL 3221148, at *1 (S.D.N.Y. June 9, 2016) (denying motion to decertify class and collective of assistant store managers); *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 15 Civ. 10446, 2016 WL 1043429 (N.D. Ill. Mar. 16, 2016) (certifying collective of nationwide assistant managers); *Watson v. Jimmy John's, LLC*, No. 15 Civ. 6010, 2015 WL 7180516, at *1 (N.D. Ill. Nov. 13, 2015) (certifying collective of nationwide assistant managers); *Flood v. Carlson Restaurants Inc.*, No. 14 Civ. 2740, 2015 WL 260436, at *1 (S.D.N.Y. Jan. 20, 2015) (certifying collective of nationwide tipped workers); *Ballinger v. Advance Magazine Publishers, Inc.*, No. 13 Civ. 4036, 2014 WL 7495092, at *7 (S.D.N.Y. Dec. 29, 2014) (appointing O&G as class counsel, explaining that "[b]ased on the firm's performance before [the court] in this and other cases and its work in the foregoing and other cases, [the court has] no question that it will prosecute the interests of the class vigorously."); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 477 (S.D.N.Y. 2013) (noting that O&G "are experienced employment lawyers with good reputations among the employment law bar"); *Yuzary v. HSBC USA, N.A.*, No. 12 Civ. 3693, 2013 WL 1832181, at *4 (S.D.N.Y. Apr. 30, 2013) (appointing O&G as class counsel); *Capsolas v. Pasta Resources Inc.*, No. 10 Civ. 5595, 2012 WL 1656920, at *2 (S.D.N.Y. May 9, 2012) (appointing O&G as class counsel and noting O&G attorneys "have years of experience prosecuting and settling wage and hour class actions, and are well-versed in wage and hour law and in class action law"); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 622 (S.D.N.Y. 2012) (O&G attorneys "have substantial experience prosecuting wage and hour and other employment-based class and collective actions"); *Johnson v. Brennan*, No. 10 Civ. 4712, 2011 WL 1872405, at *2 (S.D.N.Y. May 17, 2011) (appointing O&G as class counsel); *McMahon v. Olivier Cheng Catering & Events, LLC*, No. 08 Civ. 8713, 2010 WL 2399328, at *6

(S.D.N.Y. Mar. 3, 2010) (O&G "are experienced employment lawyers with good reputations among the employment law bar . . . [and] have prosecuted and favorably settled many employment law class actions, including wage and hour class actions"); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008) (O&G lawyers have "an established record of competent and successful prosecution of large wage and hour class actions, and the attorneys working on the case are likewise competent and experienced in the area").

### Overview of Investigation, Litigation, and Settlement Negotiations

10. Before the initiation of this action, Plaintiff's Counsel conducted a thorough investigation into the merits of the potential claims and defenses.

11. Plaintiff's Counsel focused their investigation and legal research on the underlying merits of the potential class and collective action members' claims, the damages to which they were entitled, and the propriety of collective action certification.

12. Plaintiff's Counsel obtained and reviewed documents from Plaintiff, additional SMs, and other sources, including job descriptions, pay records, and corporate documents. Plaintiff's Counsel also conducted in-depth interviews of multiple SMs, including the eight SMs who opted into this litigation.

13. In a letter dated May 2, 2016, Plaintiff's Counsel—Outten & Golden LLP ("O&G") and the Shavitz Law Group, P.A. ("SLG")—informed Defendants of the allegations that SMs were misclassified as exempt and of their intent to litigate if a pre-litigation settlement could not be reached.

14. The parties engaged in pre-suit settlement negotiations, including attending a private mediation session with Mark L. Irvings, an experienced wage and hour mediator, on March 29, 2017.

15. As part of this process, Defendants produced data to allow the parties to calculate damages, including data showing the number of potential collective members in the job title, salaries, and weeks worked. Plaintiff's Counsel analyzed this data and constructed a damages model. The parties then drafted mediation briefs setting forth their respective positions as to liability and damages, and Plaintiff provided Defendants with his brief so that Defendants could evaluate the strengths of Plaintiff's claims.

16. Although the parties made progress that would eventually lead to settlement, the parties were unable to resolve their dispute at the mediation.

17. Defendant moved to dismiss Plaintiff Melissa Chen's claims and compel arbitration. ECF No. 22. Plaintiff's opposition to Defendants' motion to dismiss was predicated on the then-law of the Circuit. *See Lewis v. Epic Sys. Corp.*, 823 F.3d 1147 (7th Cir. 2016). After the Supreme Court overturned that decision (*see Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018)), Plaintiff withdrew his opposition, and Ms. Chen's claims were compelled into arbitration. Plaintiff's counsel subsequently prepared the papers required for Ms. Chen to pursue her claims in arbitration, and would have initiated arbitration if not for this settlement.

18. The parties engaged in substantial discovery. This included exchanging initial disclosures, drafting and responding to discovery requests and interrogatories, collecting, reviewing and producing responsive Plaintiff documents, reviewing thousands of pages of documents produced by Defendants, and preparing a deficiency letter as to that production (which was set to be sent just as Defendants agreed to settlement). The parties also engaged in extended negotiations over the terms of a protocol for the production of electronically-stored information.

19.     The parties briefed Defendants' contested request for Court-ordered depositions prior to filing their response to Plaintiff's 216(b) motion, and attended a telephonic Court conference on that dispute.  After the Court ordered that depositions be taken of Plaintiff Salas and Opt-in Plaintiffs Young and Holliday, ECF No. 92, Plaintiff's counsel worked to coordinate those depositions with Defendants, negotiated a protective order, reviewed documents pertaining to those Plaintiffs, prepared Plaintiff Salas and Opt-in Plaintiff Holliday for their depositions, and defended Opt-in Plaintiff Holliday's deposition.

20.     On May 17, 2018, the Court scheduled a settlement conference for August 29, 2018 and set related deadlines.  Pursuant to this Order, the parties exchanged formal settlement proposals on August 15 and August 22, 2018, and the parties submitted confidential settlement statements to the Court on August 24.

21.     In the months leading up to this settlement conference, the parties continued to negotiate privately in an attempt to reach a settlement.

22.     On August 27, 2018, the parties reached agreement on the essential terms of a settlement.

23.     The day after this agreement was executed, Defendants' counsel and Plaintiff's counsel jointly called the Court to inform the Court that the parties had reached a settlement, as indicated in the Court's August 28, 2018 Order vacating deadlines and denying all pending motions without prejudice as moot.

24.     Following the Court's Order denying Plaintiffs' motion for settlement approval, the parties resumed settlement negotiations.  Over the last three months, the parties engaged in extensive discussions to (1) resolve the discrepancy in the proposed collective identified by the

Court, and (2) reach complete agreement as to the terms of the settlement and the notice program.

25. On March 19, 2019, the parties executed the Settlement Agreement.

### Settlement Terms

26. The Settlement Agreement establishes a fund of $1,200,000.00 (the "Fund") from which Eligible Settlement Collective Members can claim settlement awards. Ex. 1 (Settlement Agreement) ¶ 1.12. The Fund covers any Court-approved Service Payments, any Court-approved attorneys' fees and costs, and the Settlement Administrator's fees and costs, in addition to collective member awards. *Id.*

27. Eligible Settlement Collective Members are "current and former employees employed by Defendants in the position of Store Manager during the Relevant Period, who worked more than 40 hours in a workweek but did not receive an overtime premium for such hours and did not sign an arbitration agreement." *Id.* ¶¶ 1.10, 1.24 (defining the "Relevant Period" as "the time period between August 30, 2015 and October 30, 2016"). As defined, the collective only includes Lids Store Managers who did not receive overtime premiums when they worked more than 40 hours in a workweek. There are approximately 686 Eligible Settlement Collective Members. *Id.* ¶ 1.10.

28. Until October 30, 2016, Lids maintained the following policy: during weeks when SMs "supervised" the equivalent of 80 hours or more of employee time in a week, Lids did not pay them overtime premiums. In those weeks when SMs "supervised" the equivalent of less than 80 hours of employee time, Lids paid them overtime premiums according to the fluctuating workweek ("FWW") method. Pursuant to the FWW, during these workweeks Lids paid SMs an overtime premium of one-half of their regular hourly rate for that week for each overtime hour worked. Plaintiffs disagree that SMs "supervised" any employees.

8

29. This limitation of the settlement collective to exempt individuals prior to Lids' reclassification of the position was always the intent of the parties' agreement. However, the term sheet that Plaintiffs previously requested the Court approve did not explicitly contain that limitation.

30. The Settlement Administrator will mail notice of the settlement, a claim form, and a postage prepaid return envelope to all Eligible Settlement Collective Members within fifteen days of the Approval Date. *Id.* ¶¶ 1.2, 2.7. The proposed Settlement Notice and Claim Form will inform Eligible Settlement Collective Members of the nature of the dispute, the terms of the settlement, how to access their individual settlement allocations on a dedicated settlement website (which the Settlement Administrator will calculate based on Defendants' data), the scope of the release, their right to participate or not, and provide a simple claim form for them to submit. *Id.* ¶ 3.4(i); *see also id.* at Ex. B (Settlement Notice and Claim Form). The Settlement Administrator will also mail a Reminder Postcard to all Eligible Settlement Collective Members fifteen days after the original Settlement Notices are mailed. *Id.* ¶ 2.7.

31. To submit a Claim Form, an Eligible Settlement Collective Member will have the later of: (i) 30 calendar days; or (ii) for individuals receiving a re-mailing or a Cure Letter, 45 days from the date of the initial mailing. *Id.* ¶ 2.9(i). Claim Forms can be submitted by mail, fax, or e-mail. *Id.* If a Claim Form is returned and not properly completed, the Settlement Administrator will send a Cure Letter including a new Claim Form to be completed, and the Eligible Settlement Collective Member will have the remainder of 45 days from the date of the initial mailing to return a new Claim Form. *Id.*

32. Defendants will provide the Settlement Administrator with the Gross Settlement Amount and Employer Payroll Taxes within fifteen days after the Effective Date. *Id.* ¶¶ 1.9,

3.1(ii), (iv). The Settlement Administrator will mail checks to all Participating Settlement Collective Members within thirty days of the Effective Date. *Id.* ¶¶ 1.9, 3.1(iii), (iv). Participating Settlement Collective Members will have 120 days to negotiate their Settlement Checks. *Id.* ¶ 3.1(iv). The Settlement Administrator will send a reminder postcard via U.S. mail within sixty days after the mailing to Participating Settlement Collective Members who have not negotiated their Settlement Checks. *Id.* ¶ 3.1(v). Uncashed checks will revert to Defendants. *Id.* ¶ 3.1(iv).

33. All Participating Settlement Collective Members will release, from August 30, 2015, through October 30, 2016, any and all local, state, and federal claims for allegedly unpaid overtime wages, and related claims for penalties, interest, liquidated damages, attorneys' fees, costs, and expenses, related back to the full extent of the local, state and federal statutes of limitations, relating to those weeks in which they worked more than 40 hours in a workweek but did not receive an overtime premium for such hours. *Id.* ¶ 4.1. An Eligible Settlement Collective Member who does not timely execute and return a Claim Form will not release any claims. *Id.* ¶ 4.2.

34. Eligible Settlement Collective Members will be eligible for a settlement payment pursuant to an allocation formula based on the number of weeks they worked during the Relevant Period and did not receive an overtime premium for hours worked over 40 in those weeks. *Id.* ¶ 3.4. For each week worked by each Eligible Settlement Collective Member for which they did not receive an overtime premium, the Settlement Administrator will divide the total gross wages by the hours worked in that week, divide the result by two, and multiply that amount by the number of overtime hours worked that week, then sum the total for all weeks for each Eligible Settlement Collective Member to obtain each Eligible Settlement Collective

Member's "unpaid overtime premium," then sum together all unpaid overtime premiums to obtain the "Denominator." *Id.* ¶ 3.4(i)(b)(1). The Settlement Administrator will then divide each Eligible Settlement Collective Member's unpaid overtime premiums by the Denominator to obtain each Eligible Settlement Collective Members' "Percentage Interest in the Net Settlement Fund." *Id.* ¶ 3.4(i)(b)(2). The Settlement Administrator next will multiply each Eligible Settlement Collective Member's Percentage Interest in the Net Settlement Fund by the Net Settlement Fund to determine each Eligible Settlement Collective Member's Potential Settlement Payout. *Id.* ¶ 3.4(i)(b)(3).

35. The Settlement Administrator will distribute a check to each Participating Settlement Collective Member minus applicable employee payroll taxes and withholdings. *Id.* ¶ 3.4(iii)(c). For tax purposes, 50% of the payment to each Participating Collective Member shall be treated as back wages, subject to employee payroll taxes and withholdings, and 50% will be treated as interest, any applicable penalties, liquidated damages, and other non-wage relief. *Id.* ¶ 3.4(iii)(b).

36. The Settlement Agreement provides that Plaintiff and three other Service Payment Recipients will seek Court approval for service payments of $8,500. *Id.* ¶ 3.3(i). The other six Service Payment Recipients will seek Court approval for Service Payments of $2,500. The Service Payments are provided in recognition of assistance rendered in obtaining the benefits of the settlement for the collective as well as the risks the Service Payment Recipients took to do so. *Id.* ¶ 3.3(i). Plaintiff and the Service Payment Recipients assisted counsel in the investigation of the claims, produced documents to support the claims, helped prepare for the mediation, and provided their own, vital testimony that helped Plaintiff's Counsel achieve this settlement.

37.     The Settlement Administrator will be selected by Plaintiff's counsel subject to Defendants' approval.  Ex. 1 (Settlement Agreement) ¶ 1.27.  The Settlement Administrator's fees will be paid from the Fund.  Ex. 1 (Settlement Agreement) ¶ 1.12.

38.     Under the Settlement Agreement, subject to Court approval, Plaintiff's Counsel will receive $400,000 (one-third of the $1,200,000 settlement) as attorneys' fees, plus reimbursement of $14,338.47 which represents reasonable out-of-pocket costs and expenses incurred in litigating and resolving this matter.  *See* Ex. 1 (Settlement Agreement) ¶ 3.2; Ex. 8 (Summary of Costs).

## The Settlement Is Fair and Reasonable

39.     The settlement was the result of extensive pre-suit investigation; private mediation and related discovery; contested litigation involving motions to dismiss, to transfer venue, to stay, and to compel depositions, and Plaintiff's 216(b) motion; discovery including the production of over 3,300 pages of documents, one deposition and preparation for other depositions; and substantial arm's-length negotiations in preparing for the settlement conference set by the Court.

40.     Recognizing the uncertain legal and factual issues involved, the parties reached the proposed settlement only after extensive negotiations.

41.     The settlement amount of $1,200,000 for approximately 686 Eligible Settlement Collective Action Members is substantial, especially in light of the considerable risk that Plaintiff faces.

42.     Following the Court's Order, the parties engaged in extensive arm's length negotiations to resolve their disagreements about the notice program.  The parties ultimately agreed to establish a dedicated case website where Eligible Settlement Collective Members can

access their estimated pro-rata share of the settlement.  Ex. 1 (Settlement Agreement) at 3.4(i).  The parties also agreed that the Settlement Administrator will send reminder postcards halfway through the claims period to Eligible Settlement Collective Members, and halfway through the period in which Participating Settlement Collective Members must cash checks, for those who have not done so.  *Id.* ¶¶ 2.7, 3.1(v).

## Service Payments

43. Plaintiff Salas and Melissa Chen took substantial actions to protect the interests of Putative Collective Members, and those actions resulted in a substantial benefit.  They participated in an extensive pre-suit investigation, provided documents crucial to establishing their claims and the claims of the putative Collective, extensively reviewed the claims presented, and Plaintiff Salas further assisted in preparing discovery responses, preparing for a deposition, and helping Plaintiff's counsel prepare for the mediation.

44. Although Ms. Chen's claim was ultimately sent to arbitration, she was the lead plaintiff for the first thirteen months that this case was on file, and, as noted above, provided valuable assistance to Plaintiff's counsel during the initial investigation, and in litigation both during and after that time.

45. Opt-in Plaintiff Eric Holliday similarly spent several days preparing for and participating in a deposition, and he and other Service Payment Recipients prepared declarations in support of Plaintiff's 216(b) Motion.  Lindsay Dias filed a separate SM case in Massachusetts, which will be dismissed as part of the approval process here.

46. The actions of Plaintiff and service payment recipients have resulted in substantial benefit to the class, leading to an overall potential gross recovery of $1,200,000.00.

47.     Plaintiff and the other service award recipients undertook substantial direct and indirect risk. They agreed to bring the action in their names, to submit declarations in support of Plaintiff's 216(b) Motion, to be deposed, and to testify if there was a trial.

48.     Plaintiff and other service award recipients spent a significant amount of time and effort in pursuing this litigation on behalf of the Putative Collective Members. This included the time and effort they expended in pre-litigation assistance to Plaintiff's counsel in investigating the claims brought, assisting in the preparation and review of the complaint, preparing for the mediation, assisting in the drafting and review of their declarations in support of Plaintiff's 216(b) Motion, preparing for and, in Mr. Holliday's case, sitting for, depositions.

49.     The requested Service Payments amount to 3.38% of the total recovery, which is a reasonable percentage.

### **Attorneys' Fees and Costs**

50.     This settlement will provide Eligible Settlement Collective Members with a substantial cash payment. The Settlement Agreement provides that Defendants will pay a maximum settlement amount of $1,200,000.00 to settle Plaintiff's claims. See Ex. 1 (Settlement Agreement) ¶ 1.12. This is well within the range of reasonable recoveries for the Collective.

51.     The settlement represents significant value given the attendant risks of litigation. If Plaintiff continued to litigate, he would have to contend with the risks of proving SMs were non-exempt, as well as risks at class certification.

52.     Before agreeing to take on this matter, Plaintiff's counsel agreed with Plaintiff to request no more than one-third of any (at that time uncertain) future recovery, plus costs.

53.     Plaintiff's counsel created that benefit for the putative Collective, and there are no barriers to claiming it. Plaintiff's counsel have drafted a simple notice and claim form, planned

robust efforts to locate Collective Members for whom the initial notices are returned undeliverable, and allowed Collective Members to return claim forms via mail, email, or fax.

54. Plaintiff's expenses were incidental and necessary to counsel's representation. These expenses include the filing fee, *pro hac vice* admissions, postage, transportation, working meals, printing, Plaintiff's share of the mediator's fee, and electronic research.

## Exhibits

55. Attached hereto as Exhibit 1 is a true and correct copy of the Settlement Agreement, dated March 19, 2019.

56. Attached hereto as Exhibit 2 is a true and correct copy of Plaintiff's Proposed Order Granting Plaintiff's Unopposed Renewed Motion for Approval of Collective Action Settlement, Service Awards, and Attorneys' Fees and Costs.

57. Attached hereto as Exhibit 3 is a true and correct copy of *Watson v. BMO Fin. Corp.*, No. 15 Civ. 11881 (N.D. Ill. July 11, 2016).

58. Attached hereto as Exhibit 4 is a true and correct copy of *Besic v. Byline Bank, Inc.*, No. 15 Civ. 8003 (N.D. Ill. Oct. 26, 2015).

59. Attached hereto as Exhibit 5 is a true and correct copy of the Declaration of Gregg I. Shavitz.

60. Attached hereto as Exhibit 6 is a true and correct copy of the Declaration of Scott D. Gilchrist.

61. Attached hereto as Exhibit 7 is a true and correct copy of *In re Guidant Corp. ERISA Litig.*, No. 05 Civ. 1009, slip op. (S.D. Ind. Sept. 10, 2010).

62. Attached hereto as Exhibit 8 is a true and correct summary of the costs incurred by O&G in this action ("O&G Costs Summary").

Dated: March 22, 2019
       New York, NY

Respectfully submitted,

*/s/ Justin M. Swartz*

**OUTTEN & GOLDEN LLP**
Justin M. Swartz (admitted *pro hac vice*)
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
jms@outtengolden.com

*Attorney for Plaintiff and the Putative Settlement Collective*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2019, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the court's system.

        */s/ Justin M. Swartz*
        Justin M. Swartz (admitted *pro hac vice*)
        685 Third Avenue, 25th Floor
        New York, NY 10017
        Telephone: (212) 245-1000